## U.S. Fidelity and Guaranty Co. v. Franks

*Brady R. Johnson,* for plaintiff.
*Ron Turo,* for defendants.

HESS, *J.,* March 29, 1990 — This action was brought by the United States Fidelity and Guaranty Company to construe the terms of a contract of insurance issued to Russell Franks. Specifically, USF&G seeks a declaration that the underinsured policy limits are $35,000 per vehicle and that those limits are binding on all operators listed in the policy. The decision in this case requires the appli-

cation of various sections of the Motor Vehicle Financial Responsibility Act, 75 Pa.C.S. §1701 et seq., which act was in effect during all times pertinent hereto. The act requires that the insured receive notice of the various coverages permitted by law pursuant to section 1791 of the act. It also provides, generally, that uninsured and underinsured motorist coverage must be provided in amounts equal to the policy's bodily injury liability limits. Section 1734 of the act provides that the insured may waive the higher limits and select lower uninsured/underinsured coverage provided he elects to do so in writing.

Plaintiff has offered into evidence a written request, signed by Mr. Franks, which waiver clearly requests underinsured motorist coverage less than the bodily injury liability limits and specifically in the amount of $35,000. At the trial of the case, Mr. Franks admitted signing the form and, while he now claims not to have understood it, he acknowledged that he had no difficulty reading and, in fact, knew that his election would result in the lowering of his premiums.

In the case of *Nealy v. State Farm Mutual Automobile Ins. Co.,* no. 2885 Civil 1989, we recently grappled with the matter of the import of the insured's signature on the election of lower underinsured/uninsured limits. Specifically, we addressed the holding in *Prudential Property and Casualty Insurance Co. v. Pendleton,* 858 F.2d 930 (3d Cir. 1988). This latter case provides that the voluntary signing of an election to reduce coverage creates a conclusive presumption with respect to the insured's election. Critical to an understanding of *Prudential,* we felt, was the meaning of the term "voluntary." Without repeating what we said in *Nealy, supra,* it is clear that for a signature to be

"voluntary" not only must the signature have been a volitional act, but the insured must have had the opportunity to read the waiver.

At the trial of this case, Mr. Franks gave the following testimony concerning his execution of the section 1734 request for lower underinsured limits:

Q: Mr. Franks, did anyone at any time tell you that you had to sign that form for insurance?

A: No.

Q: Did you have any opportunity — let me rephrase that. Were you able to telephone call your agent?

A: Yes.

Q: And didn't you in fact call your agent at various times to discuss various items?

A: Yes.

Q: Was there anything that prevented you from calling your agent and asking him about this form?

A: No, not at all, except that I didn't know what I would be asking about anyway.

Q: You signed the form, so you had it in front of you at some point, right?

A: Yes.

Q: So you could have called your agent and asked him about the form, couldn't you?

A: If I knew what the form was telling me, yes. But I wasn't under the impression as to what it was meaning.

Q: Why did you sign it?

A: I just told you that.

Q: To reduce your premium?

A: Correct.

Q: How did you know it would reduce your premium?

A: Well, if it is a lower amount of money, I am going to pay a less premium.

Q: I understand that, but how do you know that signing that document — or how did you know that signing that document would lower your premium?

A: When they quoted me the price.

Q: So you spoke with your agent about it, and he quoted you a price that was lower?

A: Yes.

Q: They didn't tell you that you had to sign it?

A: No.

Q: They didn't tell you that you had a time limit signing it, or you wouldn't get the lower premium, did they?

A: No.

Q: Could you in fact have signed it at any time and gotten the premium?

A: I imagine so, yes.

Q: So you could have signed it a week later?

A: I could have, probably. I don't know.

Q: You could have seen an attorney about it or asked a friend about it?

A: I could have, yes.

Q: Just final questions. Do you know how to read?

A: Yes.

Q: And in fact, you subscribe to at least one magazine, don't you?

A: Correct.

Q: And you have read books from time to time?

A: Correct.

Q: And in fact, don't you read books on diesel mechanics and the like for your employment?

A: Correct.

Q: Do you have any trouble understanding those?

A: No.

Q: And you don't have dyslexia or any other reading disorders?

A: No.

It is clear that Mr. Franks' execution of the form was voluntary. In retrospect, his decision to lower underinsured limits appears to have been unwise. Notwithstanding, we know of no affirmative duty on the part of an insurance company to dissuade their insureds from making such choices. Similarly, we know of no requirement that insurers guarantee complete understanding of matters otherwise plainly explained in writing.

While the form wherewith Mr. Franks lowered his underinsured limits is undated, it is clear from all of the evidence in the case that it was executed in July 1985. Thus, the lower limits apply to the claim, made against this policy, arising out of an accident which occurred on September 13, 1987. Moreover, the election of lower limits was preceded by the giving of notice, of the various benefits under the Motor Vehicle Financial Responsibility Act, pursuant to 75 Pa.C.S. §1791. These notices were sent with the premium billing on November 8, 1984.

For all of the foregoing reasons, we believe that the declaration sought by United States Fidelity and Guaranty Company is warranted by the law and the facts of this case. Accordingly we enter the following

## VERDICT

And now, March 29, 1990, the court finds and declares that:

(1) The underinsured policy limits applicable to this case are $35,000 per vehicle pursuant to an election to reduce coverage executed by the sole named insured prior to the policy period during which the accident of September 13, 1987 occurred; and

(2) The election of Russell Franks, the sole named insured, is binding on all "operators" listed on the policy, including John Michael Franks.