**Harold E. BYERS, Administrator of the Estate of Jodi E. Byers, deceased, et al.**

v.

**AMERISURE INSURANCE COMPANY.**

Civ. A. No. 89–6061.

United States District Court,
E.D. Pennsylvania.

Aug. 20, 1990.

Michael W. Wagman, Wagman, Ashworth & Kreider, Lancaster, Pa., for plaintiffs.

Paul W. Grego, Post & Schell, Lancaster, Pa., for defendant.

## OPINION

CAHN, District Judge.

In this non-jury proceeding the plaintiffs seek reformation of two insurance policies and a declaratory judgment establishing the amount of uninsured and underinsured motorist coverage. The non-jury trial was held March 16, 1990. The parties have filed post-argument briefs. I now make the following:

### A. FINDINGS OF FACT

1. The plaintiffs are:

(a) Harold E. Byers, a citizen of Lancaster County, Pennsylvania, who sues in the dual capacities of administrator of the estate of Jodi E. Byers and in his own right;

(b) Naomi C. Byers, who is a citizen of Lancaster County, Pennsylvania.

2. The defendant is Amerisure Insurance Company, a corporation organized and existing under the laws of the State of Michigan with a principal office in the State of Michigan.

3. (a) On March 24, 1988, Jodi E. Byers, a daughter of the plaintiffs and a member of their household, was fatally injured in a multi-vehicle collision which occurred in the State of Delaware.

(b) Jodi E. Byers was a passenger in one of the vehicles involved in the collision.

4. The plaintiffs collected the limits of the public liability insurance coverage for bodily injury or death available to them from the insurance carriers insuring the drivers at fault in the aforesaid multi-vehicle accident. The amount of the proceeds collected was $122,500.00.

5. In January of 1987, the Mennonite Brotherly Aid Liability Plan notified Mr. Byers that his automobile insurance coverage was cancelled.

6. On January 9, 1987, at the request of her husband, Naomi C. Byers, telephoned CCAB Insurance Brokers to obtain insurance coverage for three vehicles.

7. On January 9, 1987, Deborah Brubaker, a married daughter of the plaintiffs, was employed as a customer service representative at CCAB. In that capacity, she reported to a Mr. Shirk.

8. Mr. Shirk and Mrs. Brubaker generally handled commercial lines of insurance.

9. Mrs. Brubaker obtained by telephone the relevant information about the vehicles and drivers from Naomi C. Byers and made arrangements with the personal lines department of CCAB to determine if coverage could be provided and, if so, at what premium.

10. The personal lines department of CCAB approved coverage and provided a premium quotation.

11. (a) Mrs. Brubaker completed the applications for two insurance policies from the defendant and signed her father's name and Mr. Shirk's name in order to obtain immediate coverage.

(b) Amerisure had authorized CCAB, Mr. Shirk, and Mrs. Brubaker to conduct business on its behalf in Pennsylvania.

12. In due course, Amerisure issued two public liability insurance policies. These were Amerisure policy no. 69–3–F78047 and 69–3–F78048. These policies covered three vehicles.

13. (a) The plaintiffs accepted the policies and paid the initial premiums for the policies. They subsequently paid the renewal premiums due in July of 1987 and January of 1988.

(b) On March 24, 1988, the two policies covering three vehicles were in force and all premiums then due had been paid.

14. Both policies had combined single limits of public liability coverage for bodily injury or death of $300,000.00 and uninsured and underinsured motorist coverage for each of the three vehicles in combined single limits of $35,000.00.

15. Neither CCAB nor Amerisure gave plaintiffs the notice of available benefits and limits described in the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.Cons.Stat.Ann. § 1791 (Purdon Supp.1990), (hereinafter MVFRL) in connection with either the policy applications or at the time of the first renewal.

## B. DISCUSSION

Initially, Amerisure contended that the underinsured motorist coverage was not subject to stacking. Amerisure has now abandoned this position and agrees that there is at least $105,000.00 of uninsured and underinsured motorist coverage (3 vehicles × $35,000.00) available to the plaintiffs.[1]

The first issue is whether this court should reform the uninsured and underinsured motorist coverage for each of the three vehicles from $35,000.00 to $300,000.00 because of Amerisure's lack of compliance with the MVFRL. If not, the plaintiffs would be entitled to a total uninsured and underinsured motorist coverage of $105,000.00. If so, then an additional issue arises, namely, whether the reformed uninsured and underinsured coverage for each of the three vehicles (owned by the plaintiffs and covered by defendant's two policies) in the amount of $300,000.00 should be stacked to $900,000.00 or whether the single combined limit of public liability for bodily injury in the amount of $300,000.00 caps the stacked underinsured motorist's

coverage at the $300,000.00 level. The parties agree and I concur that neither of these issues is subject to the arbitration process in the policy. *See Nonemacher v. Aetna Cas. & Sur. Co.,* 710 F.Supp. 602, 604 (E.D.Pa.1989).

### 1. *The Uninsured and Underinsured Motorist Coverage Should Be Reformed to $300,000.00*

The plaintiffs argue that Amerisure failed to comply with its statutory duties because it did not tell them of the available benefits when they contracted for their insurance, and thus that the policies should be reformed to the maximum authorized by statute. Amerisure contends that, even if it did not comply fully with the MVFRL, the plaintiffs nonetheless waived their rights. Amerisure notes that Deborah Brubaker was the agent of her father for the purpose of signing his name to the application.[2] Amerisure claims that it has established a waiver under general equitable principles.

Normally, a motor vehicle liability insurance policy must provide uninsured and underinsured motorist coverage equal to the bodily injury liability coverage. 75 Pa. Cons.Stat.Ann. § 1731 (Purdon Supp.1990). However, a named insured may waive full uninsured and underinsured coverage in writing, as long as the amount obtained is at least equal to the minimum statutory levels for bodily injury liability coverage. 75 Pa.Cons.Stat.Ann. § 1734 (Purdon Supp. 1990). In order to avoid uncertainty as to what constitutes a valid waiver, § 1791 sets forth the language and size of type for a notice that an insurer may include in the application advising the applicant of his statutory right to certain levels of coverage. If the insured follows § 1791 there is a conclusive presumption that the waiver is

---

1. The stacking of uninsured and underinsured motorist coverage, where an insured owns several vehicles and pays a separate premium for this coverage on each vehicle, has repeatedly been approved by the Supreme Court of Pennsylvania since its decision in *Harleysville Mut. Cas. Co. v. Blumling,* 429 Pa. 389, 241 A.2d 112 (1968), holding invalid a policy provision prohibiting stacking. *See Utica Mut. Ins. Co. v.*

*Contrisciane,* 504 Pa. 328, 473 A.2d 1005 (1984); *State Farm Mut. Auto. Ins. Co. v. Williams,* 481 Pa. 130, 392 A.2d 281 (1978).

2. I agree that he ratified her signature by paying the premiums and accepting the benefits of the coverage.

valid. *See Prudential Property and Cas. Ins. Co. v. Pendleton,* 858 F.2d 930, 936 (3d Cir.1988).

If the insurer does not follow § 1791 then it must establish waiver under the principles enunciated in *Johnson v. Concord Mut. Ins. Co.,* 450 Pa. 614, 300 A.2d 61 (1973), where the Supreme Court established that a waiver of the statutory right[3] to certain levels of uninsured motorists coverage must be "[a]ffirmatively expressed in writing by the insured," which must evidence "[a]n express agreement or acquiescence on the part of the insured to delete or relinquish this protection. The statutory mandate may be complied with only by including uninsured motorists coverage or by obtaining an affirmatively expressed rejection in writing from the insured. Nothing less will satisfy the statutory obligation." 450 Pa. at 621, 300 A.2d at 65. *Johnson* places the burden of proof to establish waiver on the insurer. 450 Pa. at 620, 300 A.2d at 65; *accord Pendleton,* 858 F.2d at 935.

■ Amerisure did not follow § 1791 because the application does not contain the required language. Consequently, Mr. Byers' signature does not ratify the reduced coverage provided in the policies.[4] Amerisure must thus meet the stringent *Johnson* test to establish that Mr. Byers waived the mandate of § 1731.[5]

Although Mr. Byers signed the policy application, there is no evidence before this court that he was shown the language mandated by § 1791. Nor is there any other evidence that at the time of application Amerisure or CCAB offered the plaintiffs an opportunity to purchase uninsured and underinsured coverage equal to the public liability coverage for bodily injury. There certainly is no evidence that the plaintiffs made a conscious decision to re-ject the enhanced coverage which was available to them. Because there is no evidence that the plaintiffs made the knowing, unequivocal waiver required by *Johnson,* I decline to find that the plaintiffs waived their rights under the MVFRL.

■ Amerisure maintains that under *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563 (1983), an insured is bound by the terms of the policy and has a duty to read the policy and reject it, if it does not provide the coverage he ordered. Amerisure contends that since Mr. Byers received the policy and never objected to the levels of uninsured and underinsured coverage, he is estopped from disputing the coverage which he "knowingly and intelligently" purchased. This argument flies in the face of *Johnson,* where the court stated:

> We agree that "[b]ecause uninsured motorist coverage has been legislatively declared to be a matter of public policy, a deletion of coverage is not to be determined by reference to traditional rules of waiver and estoppel."

*Johnson,* 450 Pa. at 622, 300 A.2d at 66 (quoting *Dufresne v. Elite Ins. Co.,* 26 Cal.App.3d 916, 926, 103 Cal.Rptr. 347, 353 (1972)); *see generally* 12A M. Rhodes, *Couch Cyclopedia of Insurance* § 45:627 (1981 & Supp.1989). *Standard Venetian Blind* concerned general liability insurance, an area less heavily governed by statute than motor vehicle coverage. There, the court applied standard contractual principles in holding that an clear and conspicuous policy limitation is to be enforced against claims that the insured failed to read or did not understand the limitation. 503 Pa. at 307, 469 A.2d at 567. Amerisure cannot use these common-law principles to defeat the plain mandate of the legislature.

---

**3.** In *Johnson,* the court construed a predecessor statute to the MVFRL, namely the Act of Aug. 14, 1963, Pub.L. 909, § 1, (codified at 40 Pa.Stat. Ann. § 2000 (Purdon 1971)).

**4.** *Pendleton* is hence distinguishable, because there the insured had received a copy of the material required by § 1791 before he signed his policy application. 858 F.2d at 933.

**5.** The *Pendleton* court observed that the MVFRL was intended to remove the lack of clarity created by the *Johnson* test. *Pendleton,* 858 F.2d at 936. This is certainly true when the § 1791 requirements are met. However, the *Johnson* test remains applicable when § 1791 has *not* been complied with, because § 1791 does not state that it constitutes the *sole* means of securing waiver.

*Cf.* 1 Pa.Cons.Stat.Ann. § 1504 (Purdon Supp.1990) (Statutory Construction Act; statutory command takes priority over common law).

The legislature has provided an unambiguous method to enable an insurer to secure a waiver of § 1731 rights from an insured. Amerisure's efforts to establish a valid waiver in this case fall far short of the *Johnson* requisites. I hold, therefore, that Amerisure has failed to prove waiver.

### 2. The Uninsured and Underinsured Coverage Should Be Stacked to $900,000.00

■ Because the answer to the first inquiry is "yes," I must determine whether the $300,000.00 of underinsured motorist coverage on each of the three vehicles should be stacked to $900,000.00 of coverage or whether this coverage is capped at the bodily injury liability limit of $300,-000.00 in accordance with concepts set forth in *Chartan v. Chubb Corp.,* 725 F.Supp. 849 (E.D.Pa.1989).[6] In *Chartan* the court construed § 1736. That section provides:

> The coverages provided under this subchapter may be offered by insurers in amounts higher than those required by this chapter but may not be greater than the limits of liability specified in the bodily injury liability provisions of the insured's policy.

The *Chartan* court concluded that § 1736's proscription against uninsured and underinsured coverage in excess of limits in the bodily injury liability provisions of a single policy also prohibits stacking above such limits. I disagree with *Chartan,* and conclude that stacking above the liability cap is permissible.

At the outset, I observe that § 1736 does not involve stacking. It caps the uninsured and underinsured motorist coverage in a single policy at the policy's bodily liability coverage limit. There is thus no explicit

statutory authority on this problem. This issue has not been addressed by the Pennsylvania Supreme Court. As a result, it is the job of this court to predict how that court would decide this issue. *Hon v. Stroh Brewery Co.,* 835 F.2d 510, 512 (3d Cir.1987); *Wilson v. Asten–Hill Mfg. Co.,* 791 F.2d 30, 32 (3d Cir.1986). In doing so, this court "must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 663 (3d Cir.1980).

In addition, the legislature has given the courts a guide to statutory interpretation, the Statutory Construction Act of 1972. 1 Pa.Cons.Stat.Ann. §§ 1501–1991 (Purdon Supp.1990). Courts sitting in diversity are to apply this when they construe statutes. *See, e.g., Pendleton,* 858 F.2d at 934–35. Under this Act a court may determine legislative intent by considering:

1. The occasion and necessity for the statute.
2. The circumstances under which it was enacted.
3. The mischief to be remedied.
4. The object to be attained.
5. The former law, if any, including other statutes upon the same or similar subjects.
6. The consequences of a particular interpretation.
7. The contemporaneous legislative history.
8. Legislative and administrative interpretations of such statute.

1 Pa.Cons.Stat.Ann. § 1921(c) (Purdon Supp.1990). The seventh criterion, legislative history, is not helpful here; this question was not addressed in the debates on the MVFRL. The other criteria, however, support this court's view of this case.

**6.** Courts faced with this question since *Chartan* have split on this issue. *Compare North River Ins. Co. v. Tabor,* 744 F.Supp. 625 (M.D.Pa.1990) (allows stacking) *with West American Ins. Co. v. Park,* No. 90–1266, 1990 WL 87284 (E.D.Pa. June 18, 1990) (does not allow stacking). *Cf. Arnold v. Government Employees Ins. Co.,* 202 *Legal Intelligencer* 2966 (1990) (Bock, Arb.) (allows stacking).

The MVFRL, like its predecessors, has been interpreted liberally. In construing uninsured and underinsured motorist legislation, the appellate courts of Pennsylvania have held that the "purpose of the uninsured motorist law has been frequently and consistently interpreted by our courts as providing protection to innocent victims of uninsured drivers," *Boyle v. State Farm Mut. Auto. Ins. Co.*, 310 Pa.Super. 10, 21, 456 A.2d 156, 162 (1983), and that the statutes have been " ' "designed to give monetary protection to that ... large group of persons who ... suffer grave injuries through negligent use of those highways by others," ' " *Harleysville Mut. Cas. Co. v. Blumling*, 429 Pa. 389, 395, 241 A.2d 112, 115 (1968) (quoting *Katz v. American Motorists Ins. Co.*, 244 Cal.App.2d 886, 891, 53 Cal.Rptr. 669, 672 (1966) (quoting *Continental Cas. Co. v. Phoenix Constr. Co.*, 46 Cal.2d 423, 434, 296 P.2d 801, 808 (1956))). *Accord, e.g., Tallman v. Aetna Cas. and Sur. Co.*, 372 Pa.Super. 593, 602, 539 A.2d 1354, 1359 (1988); *Drusak v. Insurance Co. of N. Am.*, 340 Pa.Super. 205, 208, 489 A.2d 914, 916 (1985); *Estate of Rosato v. Harleysville Mut. Ins. Co.*, 328 Pa.Super. 278, 282, 476 A.2d 1328, 1330 (1984). These general expressions of statutory purpose suggest that questions about coverage should be decided in favor of increased protection for accident victims, the people whose injuries this type of legislation seeks to remedy. *See Blumling*, 429 Pa. at 395, 241 A.2d at 115 (Uninsured Motorist Act to be liberally construed); 1 Pa.Cons.Stat.Ann. § 1928(c) (Purdon Supp. 1990) (remedial statutes "shall be liberally construed").

Moreover, the Pennsylvania courts have uniformly approved of stacking for class one insureds.[7] The germinal case, *Harleysville Mut. Cas. Co. v. Blumling*, 429 Pa. 389, 241 A.2d 112 (1968), allowed a named insured to stack his own uninsured motorist coverage with that of his employer, whose vehicle he had driven at the time of the accident. The Pennsylvania Supreme Court has since allowed an insured to stack his uninsured motorist coverage with that of his wife. *State Farm Mut. Auto. Ins. Co. v. Williams*, 481 Pa. 130, 392 A.2d 281 (1978). The Pennsylvania Superior Court has followed suit. *See, e.g., Tallman*, 372 Pa.Super. at 602, 539 A.2d at 1359 (permits intra-policy stacking of underinsured motorist coverage); *Estate of Rosato*, 328 Pa.Super. at 288–89, 476 A.2d at 1333–34 (permits inter-policy and intra-policy stacking of uninsured motorist coverage); *Blocker v. Aetna Cas. and Sur. Co.*, 232 Pa.Super. 111, 117–18, 332 A.2d 476, 479–80 (1975) (en banc) (allows inter-policy stacking of uninsured motorist coverage).[8] This view is held in most jurisdictions. *See generally* 1 A. Widiss, *Uninsured and Underinsured Motorist Insurance* § 13.12 (2d ed. 1990) (espousing view and collecting cases). Thus, the dominant line of Pennsylvania cases allows stacking for class one insureds; to remain consistent with the trend of state law, this court would have to find in favor of the plaintiff.

In addition, the legislature is presumed to be familiar with the case law against which it legislates. *See, e.g., Wallaesa v. Wallaesa*, 174 Pa.Super. 192, 196, 100 A.2d 149, 153 (1953). Because Pennsylvania law uniformly allowed stacking when the MVFRL was passed, it is reasonable to presume that its provisions were crafted with this predisposition in mind. Indeed, the MVFRL specifically proscribes the stacking of first-party benefits. 75 Pa. Cons.Stat.Ann. § 1717 (Purdon Supp.1990). This court must thus assume that the legislature would have barred stacking explicitly elsewhere if it had wished to do so, and that its failure to do so implicitly ratifies

---

**7.** Class one insureds are named insureds, residents of the household, and their relatives, while class two insureds are others who occupy insured vehicles and class three insureds are those who remain. *See, e.g., Utica Mut. Ins. Co. v. Contrisciane*, 504 Pa. 328, 338, 473 A.2d 1005, 1010 (1984); 31 Pa.Code § 63.2 (1990) (model insuring agreement).

**8.** The only contrary view comes in the line of cases typified by *Miller v. Royal Ins. Co.*, 354 Pa.Super. 20, 510 A.2d 1257 (1986), in which the court held that uninsured motorist coverages under a commercial fleet policy could not be stacked. Even there, though, there is authority favoring stacking. *Groff v. Continental Ins. Co.*, 741 F.Supp. 541 (E.D.Pa.1990) (Huyett, J.).

the pro-stacking doctrine in place when the MVFRL was enacted.

This court also draws support from a legislative interpretation of § 1736. In the recent amendments to the MVFRL, the question facing this court was directly addressed by the legislature. Act of Feb. 7, 1990, Pub.L. No. 6 (codified at scattered sections of 18, 42, and 75 Pa.Cons.Stat. Ann.). Section 12 of that act states that "[t]he limits of coverages available under this subchapter for an insured shall be the sum of the limits for each motor vehicle as to which the injured person is an insured." This section is codified at 75 Pa.Cons.Stat. Ann. § 1738 (Purdon Supp.1990), and there are no conforming amendments to § 1736. This strongly suggests that the legislature did not find § 1736 and § 1738 inconsistent; if it had, § 1736 would have had to be amended.

In addition, "[a]lthough this act took effect after the incident here at issue, and therefore is not controlling as a statute, it is certainly a persuasive statement of what the legislature perceives as the appropriate public policy...." *Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 143, 552 A.2d 1382, 1388 (1989) (referring to Uninsured Motorist Act and MVFRL). The intent of § 1738 is obvious, and contradicts the *Chartan* court's policy view. Thus, following the interpretative lead of the Pennsylvania Supreme Court, this court concludes that the legislature, through both its interpretation of § 1736 and its clearest statement as to its policy, intended to permit stacking above the liability cap.

This analysis in mind, I now turn to *Chartan*. A brief statement of the facts may be helpful. Chartan was fatally injured in an accident with an uninsured motorist. The decedent was insured under a primary policy written by the Aetna Casualty and Surety Company and an excess policy written by Sea Insurance Company. The Aetna primary policy provided $305,000.00 of bodily injury liability coverage and $305,000.00 of uninsured and underinsured motorist coverage for each accident. Decedent's wife, in her own right, on behalf of her children and as personal representative of her husband's estate obtained an arbitration award against Aetna for $610,000.00. Aetna paid the award and obtained a release from Mrs. Chartan from any further liability. There is no suggestion that Aetna ever contested the stacking of the uninsured motorist benefits over and above the bodily injury liability coverage provided for in the policy.

The issue in *Chartan* was whether the decedent's representative could recover under the excess policy. After determining that the clear provisions of the policy limited all coverage to $1,000,000.00, the *Chartan* court held that the uninsured motorist coverage under the excess policy could not be stacked over the public liability limits in that policy. In *Chartan* the court emphasized that § 1736 prohibits the purchase of uninsured and underinsured motorist coverage greater than the amount of liability coverage. The *Chartan* court then relied upon a footnote in *Wolgemuth v. Harleysville Mut. Ins. Co.*, 370 Pa.Super. 51, 55 n. 3, 535 A.2d 1145 (1988) (*en banc*) which states that:

> [t]he Legislature has thus prevented an insured from providing greater coverage by uninsured/underinsured coverages, for himself and his additional insureds than the amount of coverage he provides for others injured through his negligence.

*See also Tallman*, 372 Pa.Super. at 601–02, 539 A.2d at 1358 (following *Wolgemuth*). According to the *Chartan* court, the stacking of uninsured and underinsured motorist coverage over the level of bodily injury liability coverage would permit an insured to violate public policy by providing adequately for his own loss but not for the losses of potential victims of his own negligence. The court refers to an example of an individual with four vehicles who would obtain $30,000.00 of bodily injury liability coverage and $30,000.00 of uninsured/underinsured motorist coverage, giving him $120,000.00 of protection through stacking of the uninsured and underinsured motorist coverage while providing victims of his own negligence with only $30,000.00 of bodily injury coverage. 725 F.Supp. at 853. In conclusion, the *Chartan* court held

that "[t]he Legislature reasonably could not have intended to permit by means of stacking what it forbade by means of purchasing coverage directly." *Id.*

I find that I cannot follow *Chartan.* Apart from the reasons stated above, which strongly support stacking above the liability limits, the *Chartan* opinion is not soundly based in precedent and policy. Turning first to the cases, the statements in *Wolgemuth* and *Tallman* are dictum. In *Wolgemuth,* the issue before the court was whether a class two insured could stack the host's liability and underinsurance coverage. 370 Pa.Super. at 53, 535 A.2d at 1146. In *Tallman,* the court decided whether a policy term that prohibited intra-policy stacking was invalid. 372 Pa. Super. at 594, 539 A.2d at 1354. Neither case presented the issue before this court squarely, and the statements adverted to by the *Chartan* court were unnecessary to the outcome. While this court would give considerable weight to clear holdings of the Pennsylvania Superior Court, it need not do so for mere dictum. As Judge Aldisert has put it, dictum "depends for its influence upon its own merits, not upon any legal claim it has to recognition." Aldisert, *Precedent: What It Is and What It Isn't,* 17 Pepperdine L.Rev. 605, 632 (1990); *see also* 19 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4507 at 97 (1982). Thus, a court should reject dictum when it is "not intended to be a definitive resolution of the statute's meaning." *Manalis Fin. Co. v. United States,* 611 F.2d 1270, 1273 (9th Cir.1980).

Here, the statements were plainly not intended to be definitive, and they rest upon an unsupported assertion as to the legislature's policy decision. The intrinsic authority of these dicta is thus slight; in-deed, as one court has put it, "[t]o base a decision on dicta ... would be to depart from our solemn duty ... and embark upon a vain and illusory enterprise." *New England Mut. Life Ins. Co. v. Mitchell,* 118 F.2d 414, 420 (4th Cir.1941) (Parker, J.). Hence, what is left is the policy statement made by the *Wolgemuth* court and echoed in *Chartan.*

First, I infer from the fact that Aetna voluntarily paid an arbitration award which involved stacking of uninsured motorist coverage beyond the bodily injury liability limits and from the provision in the Amerisure policies that such coverage is the sum of the coverage applicable to each vehicle,[9] that the insurance industry had a clear understanding that stacking under the MVFRL of uninsured and underinsured motorist coverage may exceed the bodily injury limits set forth in the policy. Aetna is not a naive insurer, and its willingness to pay counts significantly as evidence of the expectations of an insurer about the scope of stacking. Second, Amerisure charged a separate premium for uninsured and underinsured coverage for each vehicle. Consequently, if stacking beyond the bodily injury limits were not permissible, then an insurer would receive a windfall when it charged separate premiums in connection with several vehicles for uninsured and underinsured motorist coverage which provided no additional protection to the insured.[10] This argument, as applied to stacking generally, has been adopted by the Pennsylvania courts. *See, e.g., Selected Risks Ins. Co.,* 520 Pa. at 142, 552 A.2d at 1388; *Contrisciane,* 504 Pa. at 338, 473 A.2d at 1010; *Marchese v. Aetna Cas. and Sur. Co.,* 284 Pa.Super. 579, 585–86, 426 A.2d 646, 649 (1981).[11]

**9.** The relevant provision reads:

Limit of Liability....
If bodily injury is sustained in an accident by you or any family member, our maximum limit of liability for all damages in any such accident is the *sum* of the limits of liability for Uninsured/Underinsured Motorist Coverage shown in the Schedule or in the Declarations applicable to each vehicle.
Plaintiff's Exh. 8 at 2.

**10.** Mr. Byers was charged three separate amounts (one for each vehicle) for the $35,-000.00 of uninsured and underinsured coverage. Since the policies are to be reformed to provide $300,000.00 of uninsured and underinsured motorist coverage for each vehicle, Amerisure will be entitled to charge additional premiums for the increased limits from the inception of the policies.

**11.** In particular, it is clear that a single policy for a household would provide uninsured and

Though the *Chartan* court has stated that § 1736 is sensible only if it is read to include both purchased coverage and stacked coverage, this does not follow from the statutory language or the considerations discussed above. The legislature could have wished to limit class *two* uninsured and underinsured motorist coverage. Section 1736 does this very effectively; because class two benefits cannot be stacked, it prevents class two insureds from recovering in excess of the bodily liability coverage. *Contrisciane*, 504 Pa. at 337–38, 473 A.2d at 1010 (no stacking of uninsured coverage under fleet policy for class two insureds); *General Accident Ins. Co. v. St. Peter*, 334 Pa.Super. 6, 12, 482 A.2d 1051, 1054 (1984) (no stacking of uninsured coverage for class two insureds). Moreover, it puts a significant limit on the ability of a class one insured to secure uninsured motorist coverage. Since such coverage can be purchased only up to the bodily liability limit, an automobile owner can purchase more uninsured coverage only if he purchases and insures a new automobile. The bulk of any insurance expense is the bodily liability coverage, which cannot be stacked. Thus, an owner is effectively restricted by § 1736 to whatever uninsured motorist coverage he can purchase for automobiles that he would otherwise have insured (that is, the bodily liability caps for those vehicles). Given the legislature's later enactment of § 1738, discussed above, this is a more plausible interpretation than that of the *Chartan* court.

In light of the express policy of Pennsylvania to interpret uninsured and underinsured motorist coverage provisions liberally, the trend of the courts to allow stacking for class one insureds, the legislative interpretation of § 1736 implicit in its enactment of § 1738, the clear expectations of the insured and the insurer, given the premiums paid and the policy language, and in light of the legislative intent to give monetary protection to persons who are injured by uninsured and underinsured motorists, I fail to understand how § 1736 can be construed to nullify coverage charged for by the insurer and paid for by the insured. I must therefore reject the holding in *Chartan* and find that stacking of uninsured and underinsured motorist coverage up to the amount of the damage is permissible for class one insureds, whatever the bodily liability limit of the primary policy.

I reach the following:

## C. CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the controversy in that there is complete diversity of citizenship between the plaintiffs and the defendant.

2. This court has *in personam* jurisdiction over the parties who have appeared personally and through counsel.

3. Proper venue lies in this court.

4. Plaintiffs are entitled to $900,000.00 of underinsured motorist coverage in an arbitration to be held pursuant to the terms of the policies in question.

5. Jodi Byers is a member of the household of Harold E. Byers and Naomi C. Byers.

6. An order will be entered.

## ORDER

AND NOW, this 20 day of August, 1990, IT IS ORDERED AND DECREED as follows:

1. It is declared that the limits for uninsured-underinsured motorist coverage in Amerisure policy nos. 69–3–F78047 and 69–3–F78048 are $300,000.00 for each vehicle with a total stacked coverage of $900,-

underinsured motorist protection for all named insureds, whether or not they were in an insured vehicle. Consequently, the added protection that further coverage yields, apart from the benefits of stacking, is merely due to the added risk that results from the presence of another auto in the insured's household. This additional risk is slight; after all, most of the travel that a class one insured would undertake would take place in either the previously-insured vehicle or in another vehicle. The risk would drop further as additional vehicles would be added. As a result, when multiple vehicles are insured, and where, as here, the premiums for the uninsured/underinsured coverage of the additional vehicles are substantial, the only satisfactory explanation is that they were charged for stacked coverage.

000.00 for the accident which occurred in Delaware on March 24, 1988.

2. The Clerk is directed to close the within docket for statistical purposes.